UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                :

In re Bernard L. Madoff Investment Securities, LLC,  :
                       Debtor.          :

------------------------------------------------------------X


------------------------------------------------------------X
                                :

DIANA MELTON TRUST, DATED 12/05/05,   :
                     Appellant,   :

        -v-                 :

                                :

IRVING H. PICARD, *Trustee for the Liquidation of*  :
*Bernard L. Madoff Investment Securities LLC*,   :
                     Appellee.   :

------------------------------------------------------------X

EDWARD A. ZRAICK, JR. et al.,       :
                    Appellants,  :

        -v-                 :

                                :

IRVING H. PICARD, *Trustee for the Liquidation of*  :
*Bernard L. Madoff Investment Securities LLC*,   :
                     Appellee.   :

------------------------------------------------------------X

MICHAEL MOST,             :
                    Appellant,  :

        -v-                 :

IRVING H. PICARD, *Trustee for the Liquidation of*  :
*Bernard L. Madoff Investment Securities LLC*,   :
                     Appellee.   :

------------------------------------------------------------X

AARON BLECKER et al.,         :
                    Appellants,  :

        -v-                 :

IRVING H. PICARD, *Trustee for the Liquidation of*  :
*Bernard L. Madoff Investment Securities LLC*,   :
                     Appellee.   :

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/14/16

OPINION & ORDER

15 Civ. 1151 (PAE)

15 Civ. 1195 (PAE)

15 Civ. 1223 (PAE)

15 Civ. 1236 (PAE)

```
-------------------------------------------------------------------X
ELLIOT G. SAGOR,                              :
                            Appellant,        :
              -v-                             :          15 Civ. 1263 (PAE)
                                              :
IRVING H. PICARD, Trustee for the Liquidation of  :
Bernard L. Madoff Investment Securities LLC,  :
                            Appellee.         :
-------------------------------------------------------------------X
```

PAUL A. ENGELMAYER, District Judge:

　　This appeal from a Bankruptcy Court decision arises out of the infamous Ponzi scheme carried out by Bernard L. Madoff.  It addresses the latest in a series of challenges to decisions by the court-appointed Trustee administering the estate of Bernard L. Madoff Investment Securities LLC ("BLMIS") as to the mechanics by which funds in the BLMIS customer property estate are to be allocated among BLMIS's customers.

　　In 2011, the United States Court of Appeals for the Second Circuit approved the "Net Investment Method" for calculating a BLMIS customer's "net equity"—the touchstone by which the customer's right to share ratably in distributions from the BLMIS estate is to be measured. *See In re BLMIS*, 654 F.3d 229 (2d. Cir. 2011) ("*Net Equity Decision*"), *cert. denied*, 133 S. Ct. 24 & 25 (2012).  The Circuit rejected the alternative "Last Statement Method," under which a customer's net equity would have been determined based on the value listed on a customer's last account statement issued by BLMIS.

　　As the Circuit recognized, that method was flawed because BLMIS's account statements reflected the make-believe investment profits invented by Madoff to perpetuate his scheme. Instead, under the Net Investment Method approved by the Circuit, net equity is determined by calculating the total amount of principal that was invested in a customer's account (cash in) minus the total amount of money withdrawn from that account (cash out).  Thus, if a customer,

during the life of an account, had withdrawn more money than she had invested, the account would have zero net equity, even if the BLMIS statements for the account reported a positive balance reflecting ostensible investment "profit" that BLMIS falsely claimed to have made for the account.

This appeal addresses a corollary issue: how the Net Investment Method is to be applied in the context of transfers of funds between BLMIS customer accounts ("inter-account transfers"). Judge Bernstein of the United States Bankruptcy Court for the Southern District of New York resolved that issue in a December 8, 2014 memorandum decision ("*Inter-Account Bankruptcy Decision*")[1] and a December 22, 2014 implementing order ("Order").[2] These rulings granted the Trustee's motion to approve his proposed treatment of such inter-account transfers.[3]

Concretely, the issue presented is how to calculate the net equity in an account when some funds in it came not from a deposit of real money from the outside world, but from a transfer from another BLMIS account before Madoff's fraud came to light.[4] The potential problem raised by such a transfer is that the money entering the transferee (recipient) account may or may not be supported by actual principal invested in the transferor (source) account. It may instead reflect fictitious profits in the transferor account. The Trustee's chosen method, the "Inter-Account Method," addresses this problem by crediting the transfer as cash in to the

---

[1] *See In re BLMIS*, Adv. Pro. No. 08-01789, Dkt. 8680.

[2] *Id.*, Dkt. 8857.

[3] *Id.*, Dkt. 6084.

[4] Like the Bankruptcy Court in its decision below and the parties in their briefs, the Court here uses terms such as "transfer," "transferor," and "transferee" for convenience, to describe in accessible lay terms the movement of funds from one account to another. The Court does not use these terms as legal terms of art, *e.g.*, so as to carry the meanings assigned to them within the Bankruptcy Code. *See* 11 U.S.C. § 101(54).

transferee account only to the extent that, at the time of the transfer, the transferor account had a surplus of cash deposits in excess of withdrawals in it—*i.e.*, net equity as calculated by the Net Investment Method.

For the reasons that follow, the Court affirms the Bankruptcy Court's Order approving the Inter-Account Method. Rejecting claims made by four appellants or groups thereof, the Court holds that this approach is the only method of calculating net equity in the context of inter-account transfers that is consistent with the Second Circuit's *Net Equity Decision*, and that it is not prohibited by law.

## I.   Background[5]

### A.   Factual Background and Relevant Madoff Case law

The infamous multibillion-dollar Madoff Ponzi scheme has been chronicled in detail in prior decisions of courts in this Circuit. *See, e.g.*, *In re BLMIS*, 424 B.R. 122, 125–32 (Bankr. S.D.N.Y. 2010) ("*Net Equity Bankruptcy Decision*"), *aff'd*, 654 F.3d 229 (2d Cir. 2011); *Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411, 415–17 (2d Cir. 2014) ("*546(e) Decision*"), *cert. denied*, 135 S. Ct. 2858 & 2859 (2015); *SIPC v. BLMIS (In re BLMIS)*, 499

---

[5] This decision resolves four appeals: by (1) the Diana Melton Trust, Dated 12/05/05, 15 Civ. 1151; (2) Edward A. Zraick, Jr. *et al.*, 15 Civ. 1195; (3) Aaron Blecker *et al.*, 15 Civ. 1236; and (4) Elliot G. Sagor, 15 Civ. 1263. (A fifth appellant, Michael Most, withdrew his appeal on November 20, 2015. 15 Civ. 1223, Dkt. 32.) Helpfully, the first three appellants filed joint briefs, 15 Civ. 1151, Dkts. 12 ("Appellants' Br."), 24 ("Appellants' Reply"), and an accompanying appendix, 15 Civ. 1151, Dkt. 12, Exs. ("Appellants' App'x"). Unless otherwise specified, references here to arguments made by "appellants" will be used to refer to those made in these joint briefs. Appellant Sagor submitted separate briefs, 15 Civ. 1263, Dkts. 13 ("Sagor Br."), 29 ("Sagor Reply"), and an accompanying appendix, 15 Civ. 1263, Dkt. 13, Exs. ("Sagor App'x"), and made arguments distinct to his circumstances, while also adopting the arguments by the other appellants, including Most, 15 Civ. 1223, Dkts. 11 ("Most Br."), 23 ("Most Reply"). Appellees, Irving H. Picard, as Trustee for the liquidation of BLMIS, and the Securities Investor Protection Corporation ("SIPC"), each filed a brief addressing all appellants' arguments, 15 Civ. 1151, Dkts. 20 ("SIPC Br."), 21 ("Tr. Br."), and an accompanying appendix, 15 Civ. 1151, Dkt. 21, Ex. ("Tr. App'x").

B.R. 416, 419 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*"), *certification for interlocutory appeal denied*, 987 F. Supp. 2d 309 (S.D.N.Y. 2013).  The Court assumes familiarity with those facts and decisions and sets out here only the facts most germane to this appeal.

### 1.     The Madoff Ponzi Scheme

BLMIS was an investment firm that collected investors' funds and purported to invest them in securities according to a "split-strike conversion strategy" that was ostensibly designed to produce consistently high rates of return on investments, although in fact the "rates of return Madoff assigned to different customers' accounts varied significantly and arbitrarily."  *Net Equity Decision*, 654 F.3d at 231–32 (internal quotation marks omitted).  Madoff never actually invested investors' money.  Instead, BLMIS "generated fictitious paper account statements and trading records" to conceal his fraud.  *Id.* at 231.  Thus, Madoff produced no actual profits for his clients, instead operating a classic Ponzi scheme in which he used new principal infused by "new and existing customers to fund withdrawals of principal and supposed profit made by other customers."  *Id.* at 232.

In 2008, Madoff's scheme collapsed, when the money coming in from new investments no longer could support the redemptions sought by his customers.  *Id.*[6]  In the end, the "final customer statements issued by BLMIS falsely recorded nearly $64.8 billion of net investments and related fictitious gains."  *Id.*

### 2.     The SIPA Trustee and the Statutory Framework

After Madoff's arrest for securities fraud, a court in this District granted an application by the Securities Investor Protection Corporation ("SIPC"), issuing a protective order under the

---

[6] *See* Amir Efrati et al., *Top Broker Accused of $50 Billion Fraud*, Wall St. J., Dec. 12, 2008, *available at* http://www.wsj.com/articles/SB122903010173099377.

Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. § 78aaa *et seq.*, and appointing

Irving H. Picard as Trustee for BLMIS's liquidation. *Net Equity Decision*, 654 F.3d at 233.[7]

"In a SIPA liquidation, a fund of 'customer property,' separate from the general estate of

the failed broker-dealer, is established for priority distribution exclusively among customers.

The customer property fund consists of cash and securities received or held by the broker-dealer

on behalf of customers, except securities registered in the name of individual customers." *Net

Equity* Decision, 654 F.3d at 233 (citing 15 U.S.C. § 78lll(4)).

Under SIPA, customers of the failed broker-dealer are to "share ratably in such customer

property on the basis and to the extent of their respective net equities." 15 U.S.C. § 78fff–

2(c)(1)(B). "Net equity" under SIPA is defined as:

> the dollar amount of the account or accounts of a customer, to be determined by—
> (A) calculating the sum which would have been owed by the debtor to such
> customer if the debtor had liquidated, by sale or purchase on the filing date—(i) all
> securities positions of such customer . . . ; minus (B) any indebtedness of such
> customer to the debtor on the filing date . . . .

*Id.* § 78lll(11). SIPA provides that the Trustee shall pay its obligations to customers, including

those based on their net equity, "insofar as such obligations are ascertainable from the books and

records of the debtor or are otherwise established to the satisfaction of the trustee." *Id.* § 78fff–

2(b).

Frequently in SIPA liquidations—and as is all but certain to be the case with respect to

BLMIS—"the assets in the customer property fund are insufficient to satisfy every customer's

---

[7] SIPC is "a nonprofit corporation consisting of registered broker-dealers and members of
national securities exchanges that supports a fund used to advance money to a SIPA trustee," and
BLMIS, "[b]y virtue of its registration with the SEC as a broker-dealer, . . . is a member of
SIPC." *Net Equity Decision*, 654 F.3d at 232–33 & n.3.

'net equity' claim." *Net Equity Decision*, 654 F.3d at 233.[8] "In such a case, SIPC advances money to the SIPA trustee to satisfy promptly each customer's valid 'net equity' claim," *Net Equity Decision*, 654 F.3d at 233, up to a maximum of $500,000 per customer for claims for securities, and up to $250,000 per customer for claims for cash, 15 U.S.C. §§ 78fff–3(a), (d).

In addition to the specific duties assigned to a SIPA trustee specified by the Act, SIPA trustees also have "the general powers of a bankruptcy trustee." *Net Equity Decision*, 654 F.3d at 231 (citing 15 U.S.C. § 78fff–1). SIPA trustees are empowered under the Bankruptcy Code to avoid fraudulent transfers to reclaim additional funds for the customers if, absent the transfer, the funds would have been customer property. *See 546(e) Decision*, 773 F.3d at 414 (citing 15 U.S.C. §78 fff–2(c)(3)); *see also* 11 U.S.C. § 548(a)(1); *Net Equity Decision*, 654 F.3d at 242 & n.10. Significantly, however, avoidance actions may only be taken to recover funds transferred within two years of the date of the filing of the petition (the "reach-back period"). 11 U.S.C. § 548(a)(1); *see also 546(e) Decision*, 773 F.3d at 415–16.

### 3.    The *Net Equity Decision*

In its 2011 *Net Equity Decision*, the Second Circuit affirmed the Bankruptcy Court's decision upholding the Trustee's use of the Net Investment Method to calculate BLMIS customers' net equity. *Net Equity Decision*, 654 F.3d at 231. The Net Investment Method calculated net equity by "crediting the amount of cash deposited by the customer into his or her BLMIS account, less any amounts withdrawn from it. The use of the Net Investment Method

---

[8] According to his latest Interim Report, the Trustee has "recovered or reached agreements to recover" approximately $10.9 billion out of a total of $20 billion in lost customer principal, and customer claimants have filed claims seeking to recover $17.5 billion of that lost principal. *See* Trustee's Fourteenth Interim Report for the Period April 1, 2015 Through September 30, 2015, at 1 & n.3, Adv. Proc. No. 08–01789, Dkt. 11912. At the time Madoff's scheme collapsed, BLMIS's fictitious account statements for customers recorded a total of $64.8 billion in customer holdings. *See Net Equity Decision*, 654 F.3d at 232.

limits the class of customers who have allowable claims against the customer property fund to those customers who deposited more cash into their investment accounts than they withdrew, because only those customers have positive 'net equity' under that method." *Id.* at 233 (citation omitted).  Many objecting customers had advocated for the alternative Last Statement Method, under which net equity would have been determined by "the market value of the securities reflected on their last BLMIS customer statements." *Id.*

In approving the Net Investment Method, the Second Circuit acknowledged that SIPA's text "does not prescribe a single means of calculating 'net equity'" and that "[d]iffering fact patterns will inevitably call for differing approaches to ascertaining the fairest method for approximating 'net equity,' as defined by SIPA." *Id.* at 235.  But, it held, in the context of the Madoff Ponzi scheme, "the Net Investment Method . . . is superior to the Last Statement Method as a matter of law," *id.* at 238 n.7, because the Net Investment Method was consistent with both SIPA's text and purposes, *id.* at 236–40.[9]

As to SIPA's text, the Circuit explained, a Trustee's methodology for calculating net equity must be assessed in conjunction with SIPA's requirement that a trustee discharge any obligations owed to customers, which includes net equity claims, to the extent such obligations are "ascertainable from the *books and records* of the debtor or [are] otherwise established to the *satisfaction of the trustee*." *Id.* at 237 (emphasis in original) (quoting 15 U.S.C. § 78fff–2(b)) (internal quotation marks omitted).  And, the Circuit stated, for two reasons relating to the

---

[9] Accordingly, the Second Circuit had no occasion to address the circumstances under which a SIPA trustee would have discretion to select a different method for calculating net equity.  *Id.* at 238 n.7.  However, the Circuit stated, it had "no reason to doubt that a reviewing court could and should accord a degree of deference . . . so long as the method chosen by the trustee allocates 'net equity' among the competing claimants in a manner that is not clearly inferior to other methods under consideration."  *Id.*

"extraordinary facts" of the Madoff scheme, that SIPA provision was relevant to the means used to calculate net equity.  *Id.* at 238.

First, Madoff had literally never purchased any securities for his customers using their funds.  *See id.* at 237–39.  Thus, SIPA's definition of "net equity," which starts by "calculating the sum which *would have been owed* . . . to such customer *if the debtor had liquidated . . . all securities positions* of such customer," uneasily fit Madoff's circumstances, because there were no such positions.  *Id.* at 237 (emphasis in original) (quoting 15 U.S.C. §78lll(11)).  Second, and relatedly, Madoff's books and records were falsified, because they reflected imaginary securities trades constructed "after-the-fact . . . to reflect a steady and upward trajectory in good times and bad, and were arbitrarily and unequally distributed among customers."  *Id.* at 238.  Use of the Net Investment Method, as opposed to the Last Statement Method, thus better accorded with SIPA's text, the Circuit held, because this method "relies solely on unmanipulated withdrawals and deposits."  *Id.* at 238 (quoting *Net Equity Bankruptcy Decision*, 424 B.R. at 140).

As to SIPA's purposes, the Circuit identified two: "to protect investors, and to protect the securities market as a whole."  *Id.* at 235 (citing *SIPC v. Barbour*, 421 U.S. 412 (1975)).  The Trustee's use of the Net Investment Method, the Circuit held, advanced both, by preserving as much of the pot of customer funds for distribution to "net loser" claimants who—having withdrawn less money than they had deposited—had not yet recovered their principal investments.  *Id.*; *see also id.* at 240 ("[I]f customers receive SIPC advances based on property that is a fiction, those advances will necessarily diminish the amount of customer property available to other investors, including those who have not recouped even their initial investment.").  In contrast, the Circuit stated, "[u]se of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real

9

and would give legal effect to Madoff's machinations." *Id.* at 235.  The Net Investment Method thus better accomplished "the main purpose of determining 'net equity' [of] achiev[ing] a fair allocation of the available resources among the customers." *Id.* at 240.

### 4.       Inter-Account Transfers and the Inter-Account Method

The *Net Equity Decision* did not address how the Net Investment Method would apply in the context of a transfer of funds from one BLMIS account to another.  Nor was that question presented to the Circuit.

Such inter-account transfers were, apparently, common.  Appellants represent that many were among family members, including in the context of inheritance—for example, where an estate transferred funds from a decedent's BLMIS account to the account of a beneficiary.  *See* Appellants' Br. 2–4, 8–9.  There is no allegation that any party to any transfer, any more than any other BLMIS customer, "knew or should have known that the investments and customer statements were fictitious," and "[i]t is unquestioned that the great majority of investors relied on their customer statements for purposes of financial planning and tax reporting, to their terrible detriment."  *Net Equity Decision*, 654 F.3d at 232; *see* Appellants' Br. 4, 7.

The *Net Equity Decision* left it to the Trustee, in the first instance, to determine how to apply the Net Investment Method to inter-account transfers.  The Trustee's approach to this problem—how to calculate net equity where part of the money that funded the customer's BLMIS account derived from an inter-account transfer—has been termed the Inter-Account Method.  The Bankruptcy Court succinctly explained the operation of this method:  "[T]he Trustee first recomputed the amount in the transferor account at the time of the transfer under the Net Investment Method.  He then credited the transferee account in an amount up to the

recomputed balance in the transferor account." *Inter-Account Bankruptcy Decision*, 522 B.R. at 48.[10]

Judge Bernstein provided the following helpful illustrations of how the Inter-Account Method would apply in practice:

> 1. Assume customer A's statement indicated a balance of $5 million, but the customer's actual net investment was only $2 million (the remaining $3 million consisting of fictitious profits). If customer A attempted to transfer the entire $5 million to customer B, customer B received credit for only $2 million—the net investment in customer A's account—leaving customer A's account with a $0 balance.

> 2. Assume, instead, that the same customer A transferred $1 million to customer B. Since customer A had an account balance of $2 million computed under the Net Investment Method—enough to cover the entire transfer—customer B received credit for the full $1 million, and customer A still had an account with a $1 million balance.

> 3. Lastly, assume that customer A's account statement indicated a balance of $5 million, but consisted entirely of fictitious profits [because customer A had already withdrawn all of the principal invested]. Customer B would not receive any benefit from an attempted transfer because customer A had $0 balance in his account under the Net Investment Method at the time of the transfer.

*Id.*

A real example, drawn from an appellant's circumstances, illustrates the interplay between the Net Investment Method and the Inter-Account Method. Appellant Barbara Kotlikoff Harman ("Barbara Harman") had a BLMIS account, which, according to the last account statement, had a balance of $1,802,563.77. Appellants' Br. 8; Appellants' App'x, AA376. The Trustee denied her net equity claim, however, because he found that she had $0 in net equity in that account under the Net Investment Method. As the Trustee explained, Barbara

---

[10] At argument, the Trustee acknowledged that the Inter-Account Method was not applied for transfers before 1981 because the Trustee's records only go back to 1981. Of necessity, for any inter-account transfer that occurred before 1981, the Trustee gave the transferee credit for the full amount of the transfer. Arg. Tr. 62.

Harman had withdrawn $1.18 million from the account, but had only made $505,045.42 in actual principal investments. Appellants' Br. 8–9; Appellants' App'x, AA393, 396–97. As a result, according to the Trustee, she was a net winner, having withdrawn $674,954.58 more than actual principal invested in the account, making whatever remained in the account fictitious profits. Appellants' App'x, AA394, 397.

In calculating Harman's total principal investments, the Trustee applied the Inter-Account Method to reduce the value of three inter-account transfers made into her account. Two, Barbara Harman alleges, were transferred by her husband, Laurence Harman, who had received the money as part of his inheritance from two separate accounts held by a trust and an estate in the names of his parents. Appellants' Br. 8; Appellants' App'x, AA375–76. The three inter-account transfers Barbara Harman received, on their face, had a combined ostensible value of $1,046,333.33. But, under the Inter-Account Method, based on the net deposits and withdrawals made in the transferring accounts at the time of the transfers, the Trustee credited Barbara Harman's account with $80,045.42 of actual principal investment from those transfers— $966,287.91 less than their face value. *See* Appellants' App'x, AA396.[11]

---

[11] Barbara Harman's claim illustrates the complexity of the Trustee's work in applying the Inter-Account Method, because the funds at issue traveled through a series of accounts before arriving in hers. The Inter-Account Method necessarily traces these funds beginning at the start of each transfer chain. As explained in Barbara Harman's submissions, the BLMIS account held by the Estate of Toby Harman (in the name of Barbara Harman's mother-in-law) was funded entirely by two inter-account transfers, totaling $700,187.98, from another BLMIS account (whose name and transactional history are not fully revealed by the documents submitted to the Court). The Trustee valued the transfers into the Estate of Toby Harman account at $0 under the Inter-Account Method, apparently because, at the time of the transfers, more money had been withdrawn from the source account than had been invested in it. Therefore, the Estate of Toby Harman account had no net equity available at any time during the account's life. The Estate of Toby Harman transferred $620,000 to an account in the name of the Toby Harman Trust, such transfer being the sole source of funds for the Trust. The Trustee valued the transfer into the Toby Harman Trust at $0 under the Inter-Account Method (although the Trust benefited, by making $270,112.00 in cash withdrawals). Laurence Harman then transferred $421,188.41 from

In sum, had the Trustee credited the inter-account transfers at full face-value, Barbara Harman would have had a positive net equity claim of $291,333.33 under the Net Investment Method. Instead, using the Inter-Account Method in combination with the Net Investment Method, the Trustee determined that Barbara Harman had $0 of net equity in the account.

### B. The Bankruptcy Court's Decision and Subsequent Appeals

The Trustee's use of the Inter-Account Method to disallow all or part of many customers' claims drew objections from more than 400 customer claimants ("the Objecting Claimants"). *Inter-Account Bankruptcy Decision*, 522 B.R. at 48. On March 31, 2014, the Trustee moved the Bankruptcy Court to approve the overall methodology over these objections. *Id.*; Adv. Pro. No. 08-01789, Dkt. 6084.

After briefing and a hearing, the Bankruptcy Court upheld the use of the Inter-Account Method. It held that this methodology "is not 'clearly inferior,' and indeed, is superior to the alternative championed by the Objecting Claimants[, and is therefore] entitled to deference." *Inter-Account Bankruptcy Decision*, 522 B.R. at 53.

The Bankruptcy Court held, in particular, that the Inter-Account Method is consistent with the Second Circuit's *Net Equity Decision*. *See id.* By contrast, it held, an approach under which the Trustee credited the Objecting Claimants' accounts with the full value of the transfer "suffers from the same shortcomings" of the Last Statement Method, in that it would "turn[] Madoff's fiction into a fact" and "diminish[] the amount available for distribution from the limited pool of customer property" for those net losers who did not withdraw enough money from their accounts to recoup their investments of principal. *Id.*

---

the Toby Harman Trust account to Barbara Harman's account, a transfer which the Trustee, again, valued at $0 under the Inter-Account Method. *See* Appellants' App'x, AA375–76, 381, 386, 396.

The Bankruptcy Court considered, and rejected, the objections made by the Objecting Claimants to the Inter-Account Method. *See id.* at 53–61. The Bankruptcy Court did not address various objections that fell outside the scope of the Trustee's Motion, including the application of the Inter-Account Method to specific claims. Nor did it consider the question of who bears the burden of proof as to a particular claimant's claims. *Id.* at 61–62.[12]

Many Objecting Claimants whose objections were overruled filed appeals from the Bankruptcy Court's decision. On February 25, 2015, this Court accepted these appeals as related, and, on March 3, 2015, set a consolidated briefing schedule. On September 17, 2015, the Court heard argument. 15 Civ. 1151, Dkt. 34 ("Arg. Tr.").

By way of overview, all appellants join together in challenging the Trustee's general application of the Inter-Account Method on the grounds that this method (1) violates customers' due process rights, (2) is inconsistent with SIPA's mandate to promote fairness, (3) contravenes other SIPA provisions requiring accounts to be treated separately, (4) conflicts with federal and state public policy regarding the finality of business transactions, and (5) exceeds the Trustee's authority. The appellants argue that the Trustee must instead credit the full value of all inter-account transfers towards a transferee's net equity, regardless of whether there was sufficient—or any—net equity in the transferor account at the time of the transfer. They argue that the Inter-Account Method is not mandated by the *Net Equity Decision* or the other precedents on which the Bankruptcy Court relied.

---

[12] At argument, all parties acknowledged that a decision upholding the Inter-Account Method would not finally resolve the determination of net equity as to any claimant. A claimant would have the opportunity in the future to review the records supporting the Trustee's determination that an inter-account transfer should be credited at less than full value and to challenge that factual determination before the Bankruptcy Court. Arg. Tr. 18–19, 28–29, 59–63.

Subsets of appellants separately challenge the Trustee's application of the Inter-Account Method to narrower factual circumstances, in particular, (1) where the transfer originated from a qualifying ERISA pension plan account, and (2) where the transfer was made to a claimant's individual account from a shared account in which the claimant had invested.[13]

## II.    Analysis

### A.    Standard of Review

District courts are vested with appellate jurisdiction over bankruptcy court rulings pursuant to 28 U.S.C. § 158(a) ("[D]istrict courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and,] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges.").  This Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."  *W. Milford Shopping Plaza v. The Great Atl. & Pac. Tea Co. (In re Great Atl. & Pac. Tea Co.)*, No. 14 Civ. 4170 (NSR), 2015 WL 6395967, at *2 (S.D.N.Y. Oct. 21, 2015) (quoting *Sumpter v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 468 B.R. 603, 611 (S.D.N.Y. 2012)).[14]

---

[13] Appellant Sagor alone raises the shared account issue.  Although he adopts the challenges to the Inter-Account Method briefed by the other appellants, he does not seek to have his net equity credited with the full value of the inter-account transfer to his account, but rather only the value of his net principal within the shared transferor account.  These circumstances are more fully described *infra*, section II.D.2.

[14] As Judge Román has explained, the quoted language was found in the former Federal Rule of Bankruptcy Procedure 8013, but was omitted from the amended Federal Bankruptcy Rules of Procedure, effective December 1, 2014.  Nevertheless, "logic still compels the same conclusion with respect to the appellate powers of the District Court."  *In re Great Atl. & Pac. Tea Co.*, 2015 WL 6395967, at *2 n.1.

A bankruptcy court's legal conclusions, including its interpretations of SIPA, are reviewed *de novo*. *Net Equity Decision*, 654 F.3d at 234; *see also Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 91 (2d Cir. 2010).

### B.   The Inter-Account Method Is Consistent with SIPA and the *Net Equity Decision* But Appellants' Alternative Method Is Not.

Although the Second Circuit's *Net Equity Decision* does not address the application of the Net Investment Method to inter-account transfers, the logic of that decision all but resolves that corollary issue—and this case.

The core principle undergirding the *Net Equity Decision* is that the Trustee must calculate a customer account's net equity in a manner that does not use the investment gains fabricated by Madoff to augment a customer's investment principal. Rather, the Trustee must perform a calculation based on real cash. The Trustee must calculate the sum of the real cash an investor put into an account minus the real cash the investor withdrew. In disdaining use of Madoff's fictitious claims to calculate net equity, the Circuit recognized that Madoff's fraud was across-the-board: He never purchased any actual securities with his customers' investment funds, and the supposedly profit-generating trades and securities listed on a customer's account statement were entirely fictitious. Therefore, the only entries in the "books and records" that have any anchor in reality are the transactions reflecting hard cash entering and exiting the account. And as the Circuit further recognized, the Net Investment Method advances SIPA's goals of protecting investors and the investment market. By refusing to inflate customer claims with fabricated investment gains, this method maximally preserves customer property for distribution among BLMIS's net losers—those who did not recoup their initial investments. It prevents an outcome in which the claims of net losers are diluted by fabricated gains.

The Trustee's Inter-Account Method faithfully extends—and inexorably follows from—the Net Investment Method as approved by the Circuit.  The Net Investment Method bases the net equity calculation on the net principal in a BLMIS customer account, measured by comparing cash deposits with cash withdrawals.  It logically follows that the recognition of transfers from one BLMIS account to another must, too, be limited by the net principal in the transferring account at the time of transfer.  Therefore, where a transferee (recipient) account claims net equity based on funds transferred from another BLMIS account, the Trustee's Inter-Account Method inquires whether there was net equity in the transferring account at that time.  This method credits transfers to a BLMIS account only to the extent that there was net equity available to be transferred.

The alternative approach to inter-account transfers—championed by the objectors—would credit at full value all transfers among BLMIS accounts.  This would be so regardless of whether, at the moment of transfer, the transferor account had net equity corresponding to the amount transferred (or any net equity at all).  However, as both the Trustee and the Bankruptcy Court recognized, this approach would necessarily result in treating certain fictitious gains in the recipient account (the amount by which the transfer exceeded the net equity in the transferring account) as if they were real.  It would thereby undermine the coherence of the Net Investment Method.  It would also give rise to unjustifiable inequities among accounts.  Alone among BLMIS accounts, those whose stated value derived from inter-account transfers of fictitious investment profit would be permitted to count such fictive profits among their net equity.

The Trustee's decision to credit inter-account transfers only to the extent of the net equity in the transferring account thus alone comports with the Circuit's *Net Equity Decision*.  And it therefore alone would accord with SIPA's statutory definition of net equity and its requirement

that net equity be determined to the extent it is "ascertainable from the *books and records* of the debtor or [is] otherwise established to the *satisfaction of the trustee*." *Net Equity Decision*, 654 F.3d at 237 (alteration and emphasis in original) (quoting 15 U.S.C. § 78fff–2(b)) (internal quotation marks omitted).

Appellants argue that the Trustee should credit in full the amount of each transfer, because the parties to the transfer viewed it in real time as involving real "cash." *See* Appellants' Br. 2, 25–28; *see also* Appellants' Reply 2, 6–7. But while appellants are surely correct that the parties to the transfer viewed themselves as transferring real money, appellants' focus departs from the approach approved in the *Net Equity Decision*, which focuses not on a customer's subjective perception as to the value of a BLMIS account but on the net investment principal in that account. *See Net Equity Decision*, 654 F.3d at 235–36 (rejecting customers' "legitimate expectations" as a basis for "ascertaining 'net equity'" under SIPA).

Appellants' approach would also depart from the Circuit's approved methodology insofar as it treats as valid a portion of BLMIS's fictitious books and records: Appellants would treat all funds that an account obtained via an inter-account transfer as real. But a cardinal premise of the Circuit's *Net Equity Decision* was that BLMIS's fictitious books and records were all but worthless for SIPA purposes, except for the parts of those records reflecting cash deposits and withdrawals. "The Net Investment Method is appropriate because it relies solely on *unmanipulated* withdrawals and deposits." *Id.* at 238 (alteration omitted) (emphasis added) (quoting *Net Equity Bankruptcy Decision*, 424 B.R. at 140) (internal quotation marks omitted).

Appellants' insistence that the transfer records are accurate, and therefore can be relied upon and credited, because BLMIS actually deducted the source account and credited the recipient account with the transfer amount, misses the point. Although the BLMIS records do

reflect balance transfers made by BLMIS customers, a balance transfer on paper cannot alter the existence, or not, of the real invested funds that are the basis of a customer's net equity under SIPA and the *Net Equity Decision*.

An illustration highlights the incompatibility of appellants' proposed approach with the Net Investment Method, and the inequities yielded if, as appellants propose, false investment gains transferred from another account were to be included among a transferee account's net equity. Consider the following scenario: Customer A has a BLMIS account whose account statement reflects a $1 million balance. Customer A is a net winner; she has already withdrawn from her account the same amount of money (or more) that she initially invested. Any balance in her account therefore reflects only fictitious profits. Customer B is a relative of Customer A. He has never invested any money with BLMIS, but has set up his account in anticipation of inheriting the funds in Customer A's account. At this point, measured under the Net Investment Method approved by the Second Circuit, Customer A's net equity would be zero. Customer B's net equity is also zero; no money has either gone in or out of his BLMIS account.[15] Customer A then dies. Following Customer A's death, per her will, the $1 million balance in Customer A's BLMIS account is transferred to Customer B's BLMIS account. Madoff's fraud is later exposed.

Under the Trustee's Inter-Account Transfer Method, the transfer would not increase the net equity in Customer B's account, because Customer A lacked any net equity to transfer. But under appellants' alternative approach, in which that transfer would be credited in full towards Customer B's net equity, the fact of the transfer would create $1 million in net equity: Whereas

---

[15] The same would be true—and the hypothetical would be equally illustrative—if Customer B's account came to have net equity of zero for other reasons, *e.g.*, if Customer B's cash investments into that account were matched by identical cash withdrawals. The salient point is that, prior to receiving a transfer from Customer A, Customer B's account had zero net equity.

the two accounts, treated independently before the transfer, had a net equity of $0, the transfer

would add $1 million in net equity to Customer B's account.  But the movement of $1 million in

fake, Ponzi scheme-manufactured profits from one account to another does not convert this sum

into real "cash," and would accord the parties to the transfer a combined benefit unavailable to

accounts not participating in such transfers.  This approach is, irreconcilably, in tension with the

*Net Equity Decision*, for it would "have the absurd effect of treating fictitious and arbitrarily

assigned paper profits[, if transferred,] as real" for the purpose of ratably allocating the limited

pool of customer property.  *Net Equity Decision*, 654 F.3d at 235.

        In holding that the Trustee's Inter-Account Method is valid and that appellants'

alternative methodology is not, such that fund transfers unsupported by net equity in the

transferor's account must be disregarded, the Court emphasizes that the Objecting Claimants

disfavored by the Trustee's methodology are blameless.  They, too, are victims of Madoff's

pernicious fraud.  They assuredly relied in good faith on the validity of the transfers.  Many

transferee accounts assuredly ordered their financial and tax affairs on the premise that they had

received real money from other BLMIS customers.  And many transferor accounts assuredly

paid estate or gift (or perhaps other) taxes based on the premise that funds resident in, and

transferred from, those accounts were real.  And like all of Madoff's victims, the Objecting

Claimants lost the opportunity to invest and grow their money through legitimate investment

vehicles.  *See SIPC v. 2427 Parent Corp. (In re BLMIS)*, 779 F.3d 74, 79–81 (2015) ("*Time-

Based Damages Decision*") (SIPA does not permit inflation adjustment for net equity claims),

*cert. denied*, 136 S. Ct. 218 (2015).

        However, some methodology must be used to guide the allocation of the limited BLMIS

customer funds available for distribution among customer accounts.  Given the Second Circuit's

adoption of the Net Investment Method, the Trustee's Inter-Account Method is a necessary

corollary.  It—and not the alternative method appellants urge—accords with the approach taken

in the *Net Equity Decision.*  It is, the Court holds, the superior method as a matter of law for

calculating net equity in the context of inter-account transfers.  *See Net Equity Decision*, 654

F.3d at 241 ("It would have been legal error for the Trustee to 'discharge claims upon the false

premise that customers' securities positions are what the account statements purport them to

be.'" (quoting *Net Equity Bankruptcy Decision*, 424 B.R. at 135)).

### C.     General Objections to the Inter-Account Method

The Court now addresses the objections to the Trustee's Inter-Account Method raised by

the Objecting Claimants.

#### 1.      Due Process

Appellants liken the application of the Trustee's Inter-Account Method to an avoidance

action by the Trustee.  They argue that it effectively allows the Trustee to indirectly unwind

transfers by reducing claimants' net equity.  *See, e.g.*, Appellants' Br. 2 ("[T]he Bankruptcy

Court allowed the Trustee to, in essence, self-effectuate fraudulent transfer judgments in his

favor."); *id.* at 12 ("The Trustee cannot do indirectly what he is prohibited from doing directly.").

So viewed, they argue, this methodology is impermissible and violates claimants' due process

rights, because it allows the Trustee to circumvent the statutory two-year reach-back period

within which fraudulent transfers can be avoided.  *Id.* at 11–13.  Instead, appellants argue, the

Trustee must recognize the full value of all Inter-Account Transfers, and may seek to avoid any

fraudulent transfers that took place within the two-year reach-back period through an adversarial

proceeding.[16]

---

[16] Appellants contend throughout their briefs that the Trustee must recognize all inter-account
transfers for their full value, although they appear to suggest that the Inter-Account Method

This objection is, at core, a statutory argument packaged as a constitutional claim.[17]  It fails because the two-year reach-back limit applicable to attempts to avoid fraudulent transfers does not apply to a Trustee's calculation of net equity.

Although net equity calculations and avoidance actions are related at a general level—in the context of an insolvent broker-dealer, each aims to facilitate the return of customer property to customers—they are governed by separate statutes situated within different titles of the United States Code, and they operate in distinct ways.  As noted, a SIPA Trustee's net equity calculation is used to determine the share of the customer property of which a customer is entitled to claim

---

violates due process only insofar as it applies to transfers that occurred outside the two-year reach-back period for avoidance actions.  *Compare*, *e.g.*, Appellants' Br. 2 ("The Trustee is obligated by federal and state law to credit the claims of Customers who received funds from other Madoff Customers through inter-account transfers . . . with the full amount of the Inter-Account Transfer."); *and* Arg. Tr. 30–31 ("MS. CHAITMAN:  Any inter account transfer, we argue, because it shows up on Madoff books, has to be recognized for the dollar amount. THE COURT:  Even if it was the day before Madoff was exposed? MS. CHAITMAN:  Yes. Now . . . Within two years, the trustee would have the right . . . to file a fraudulent transfer action, and he could void that transfer as fraudulent.  But if it's not within the statute of limitations period and it shows up on Madoff's books as a cash transfer and it could have been withdrawn by the customer . . . , I don't believe the trustee has the right under any statute to disregard that transfer."); *with* Appellants' Br. 12 ("[T]he Trustee ignored the statutory constraints . . . by refusing to credit the full amount of the Inter-Account Transfers that pre-date the Reach-Back Period. . . .  [I]f the Trustee cannot seek, through an adversary proceeding, to avoid transfers that pre-date December 11, 2006, he cannot possibly be permitted to avoid Inter-Account Transfers going back to 1960 simply by sending Determination Letters to Customers disallowing their claims."); *and* Arg. Tr. 25 ("MS. CHAITMAN:  The proper methodology is, in my opinion, that the trustee has to recognize transfers that are beyond the statute of limitations, which the Second Circuit has held is two years.").

In the interest of clarity, the Court notes that there are two distinct two-year periods at issue: (1) the two-year reach-back period that specifies which pre-filing transfers may be subject to avoidance actions, *see* 11 U.S.C. § 548(a)(1); and (2) the two-year statute of limitations within which a Trustee may bring such an avoidance action, *see id.* § 546(a)(1)(A), although appellants have sometimes conflated the two in briefs and argument.  The Court's rejection of appellants' due process challenge to the Inter-Account Method is not impacted by which two-year period appellants are referring to.

[17] *See Inter-Account Bankruptcy Decision*, 522 B.R. at 53 n.8 ("This contention elevates a faulty statutory argument to the level of an equally faulty Constitutional claim.").

ratably.  15 U.S.C. § 78fff–2(c)(1)(B).  If the customer property is insufficient to cover all

customers' net equity claims, the Trustee is authorized to "recover any property transferred by

the debtor which, except for such transfer, would have been customer property if and to the

extent that such transfer is voidable or void under the provisions of Title 11.  Such recovered

property shall be treated as customer property."  *Id.* § 78fff–2(c)(3).  It is, in turn, the Bankruptcy

Code, Title 11, that governs such actions to avoid fraudulent transfers, limiting such actions to

those transfers made by the debtor "on or within 2 years before the date of the filing of the

[bankruptcy] petition."  11 U.S.C. § 548(a)(1).

There is no legal basis to treat the two-year reach-back restriction on the avoidance of

fraudulent transfers as inhibiting the ability of the Trustee to calculate net equity.  Nothing in the

text of § 548(a)(1) indicates that the two-year restriction applies to anything other than an

avoidance action for fraudulent transfers.  And SIPA's text is to the contrary:  It requires that a

trustee's obligations to a customer be determined insofar as it is "ascertainable from the books

and records of the debtor," and imposes no temporal limit on how far back into the books and

records the Trustee's review may extend.  15 U.S.C. § 78fff–2(b).  Indeed, the Second Circuit's

approval of the Net Investment Method in the *Net Equity Decision* expressly contemplates that

the Trustee will reduce a customer's net equity for transfers of funds *out of* a BLMIS account—

*i.e.*, withdrawals—that occurred beyond the two-year reach-back period.  Such reductions are

part and parcel of the Net Investment Method, which nets all deposits and withdrawals over the

life of a BLMIS account.  *See Net Equity Decision*, 654 F.3d at 233.

To be sure, the *Net Equity Decision* referenced the Trustee's power of avoidance.  It did

so in the course of explaining that the Net Investment Method was superior to the Last Statement

Method for calculating net equity here in part *because* the Net Investment Method is "more

23

harmonious" with the Trustee's dual powers under SIPA and the Bankruptcy Code, specifically the Trustee's ability to avoid fraudulent transfers under 11 U.S.C. § 548(a)(1)(A).  *See* 654 F.3d at 242 n.10.  However, the Circuit recognized that the Net Investment Method did not rely on the Trustee's power of avoidance.  *See id.*

Thus, although the *Net Equity Decision* did not address inter-account transfers directly, that decision implicitly but definitively rejects claimants' argument that transfers more than two years before the petition date cannot be used to reduce a customer's net equity without violating § 548(a)(1)'s limitations.  Or for that matter, due process:  Due process is not offended by a dual statutory regime that permits a longer lookback for the purpose of calculating net equity and a shorter lookback period during which avoidance actions are allowed.  And there is good cause for the differing periods:  Net equity calculations and avoidance actions serve different functions, justifying different operative periods.  Net equity calculations are used to determine how much of a claim a customer has on the customer property estate assembled by the Trustee, and for that reason it is appropriate that a holistic review of account activity be undertaken.  Avoidance actions are far more disruptive.  Rather than determine the customer's share of an as-yet undistributed fund, such actions seek to reclaim money from present holders.  There is, therefore, a greater finality interest in limiting a Trustee's ability to undo transfers and claw back money that an individual received from a failed broker-dealer.

The Second Circuit's *546(e) Decision* reinforces the point.  The Circuit considered there how an exception to the Trustee's power to claw back fraudulent transfers, 11 U.S.C. § 546(e), applied to the Madoff Ponzi scheme.  *See* 773 F.3d at 414–15.  Section 546(e) provides that "transfers made by a stockbroker 'in connection with a securities contract,' or 'settlement payment[s]' cannot be avoided in bankruptcy."  *Id.* at 414 (quoting 11 U.S.C. § 546(e)).  The

Circuit held that the terms "in connection with a securities contract" or "settlement payment," as used in the Bankruptcy Code, should be construed broadly, and therefore applied to withdrawals made by BLMIS customers, even though Madoff had never purchased securities on behalf of his customers, and even if the customer's withdrawal was in excess of his or her principal invested and thereby allowed the customer to profit from Madoff's fraud.  *See id.* at 414, 417–22.

Salient here, the Second Circuit explained that its interpretation of § 546(e) was not inconsistent with the *Net Equity Decision* because SIPA and the Bankruptcy Code are distinct. "Section 546(e) . . . is part of the Bankruptcy Code, not SIPA . . . .  This is important because, in enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality."  *Id.* at 423.  The Second Circuit pointed to § 548(a)(1)—allowing a trustee to "recover fraudulent transfers . . . only when the transfers took place within two years of the petition date"—as an example of the Bankruptcy Code's provisions respecting such finality.  *Id.*

Thus, the Circuit noted, although the Trustee could discount fictitious profits in determining a customer's net equity, *see id.* (discussing the *Net Equity Decision*), §§ 546(e) and 548(a)(1) of the Bankruptcy Code "reflect that, at a certain point, the need for finality is paramount even in light of countervailing equity considerations" when it comes to avoidance actions, *id.*  Much as the Circuit did not permit its interpretation of SIPA in the *Net Equity Decision* to control its interpretation of the Bankruptcy Code in the *546(e)* decision, the Bankruptcy Code's two-year reach-back provision for avoidance of fraudulent transfers does not shackle the Trustee or this Court in its calculation of net equity.

Finally, the Court notes, its analysis here draws support from Judge Rakoff's analysis in the *Antecedent Debt Decision*, on which the Bankruptcy Court relied.  Under 11 U.S.C. § 548(c),

a defendant may assert a defense to an avoidance action "to the extent that [the transferee] gave value to the debtor in exchange for [the] transfer." The *Antecedent Debt Decision*, which predated the Second Circuit's *546(e) Decision*, addressed the extent to which withdrawals of money by BLMIS customers, even in excess of their principal investments, could be deemed made in exchange for "value" under § 548(c) as a satisfaction of an antecedent debt. 499 B.R. 416, 418–19 (S.D.N.Y. 2013). The claimants' theory was that BLMIS customers had federal and state law claims against BLMIS for the contents of their accounts, including amounts exceeding their principal investments; therefore, they argued, any withdrawals reduced BLMIS's liability on their claims and reduced BLMIS's debt, triggering § 548(c). *See id.* at 421–22.

Rejecting this argument, Judge Rakoff held that such a transfer by a customer was not made for "value" under § 548(c) where it exceeded the customer's net principal invested, *i.e.*, the customer's net equity as calculated under the Net Investment Method. *See id.* at 421–28. Judge Rakoff's reasoning turned on the relationship between SIPA and the Bankruptcy Code. He held that SIPA's protections for customers influenced the construction of the term "value" in a SIPA proceeding. *See, e.g.*, *id.* at 423 ("[A]lthough the Trustee has the same authority to avoid transfers as a bankruptcy trustee, those powers must be interpreted through the lens of SIPA's statutory scheme."); *id.* at 424 ("[T]he definition of net equity and the definition of claims that can provide 'value' to the customer property estate are inherently intertwined where the customer property estate is created as a priority estate intended to compensate customers only for their net-equity claims."). Judge Rakoff further held that the Trustee may use the Inter-Account Method to determine how much of a particular transfer reflected the customer's real principal investment, and therefore "value" under § 548(c). *Id.* at 428–29. And he rejected claimants' arguments that the Inter-Account Method improperly allowed the Trustee to circumvent the two-

year reach-back for avoidance of fraudulent transfers under § 548(a)(1), noting that "there is no time limit on what constitutes 'value' for purposes of section 546(c)."  *See id.* at 429; *see also id.* at 426–28 (explaining that use of the Net Investment Method for the calculation of value does not impermissibly circumvent § 548(a)(1) by netting transactions that occurred beyond the two-year reach-back).

Appellants attempt on various grounds to undermine the Bankruptcy Court's decision to the extent it cited the *Antecedent Debt Decision*.  They argue that Judge Rakoff's reasoning is in tension with the Circuit's *546(e) Decision*, because the *546(e) Decision* construed the terms "in connection with a securities contract" or "settlement payment" in the Bankruptcy Code separately from SIPA, while the *Antecedent Debt Decision* construed the Bankruptcy Code term "value" in light of the relationship between SIPA and the Bankruptcy Code.  Appellants further note, correctly, that unlike the Bankruptcy Court, this Court is not bound by the *Antecedent Debt Decision*, rendered as it was by a peer court.

The Court has no occasion here to comment upon the parties' competing assessments of Judge Rakoff's construction and/or application of the statutory term "value" in the *Antecedent Debt Decision*.  Highly germane, however, is Judge Rakoff's holding—which the Court finds persuasive—that § 548(a)(1)'s two-year reach-back on avoidance of fraudulent transfers is distinct from § 548(c), and therefore that that two-year restriction does not apply to or limit the use of the Inter-Account Method for calculating value under that provision.  Of course, the SIPA provisions regarding the calculation of net equity at issue here are even further removed from § 548(a)(1)'s reach-back limitation than is § 548(c).

The Court, therefore, rejects appellants' claims that use of the Inter-Account Method breaches their due process rights.[18]

### 2.    Arbitrary and Inequitable Results

Appellants next argue that the Inter-Account Method produces arbitrary and inequitable results, by treating economically equivalent transactions differently based on the manner or timing with which they were carried out, and thereby elevating form over substance. Appellants' Br. 21–24. For example, in the hypothetical described above, if Customer A, with a $1 million balance but zero net equity, transferred $1 million directly from her BLMIS account to Customer B's BLMIS account, under the Inter-Account Method, Customer B would not be credited for the deposit. However, if Customer A had withdrawn $1 million from the BLMIS account, deposited it as cash in her checking account, and then wrote a check to Customer B, who deposited it in his BLMIS account, the Inter-Account Method would credit Customer B as having made a $1 million deposit for the purposes of determining his net equity. *See id.* at 8, 21–22. This result, appellants argue, is arbitrary and unfair; they argue that SIPA should be construed flexibly to avoid this outcome. *See id.* at 23–26; *see also Net Equity Decision*, 654 F. 3d at 241 ("SIPA covers potentially a multitude of situations; no one size fits all[, and its] 'liquidation procedures have been carefully designed to allow flexibility.'" (quoting *Exch. Nat'l Bank of Chicago v. Wyatt*, 517 F.2d 453, 459 n.12 (2d Cir. 1975))).

This objection misses the mark. As to arbitrariness: The differing treatment given the two transfers hypothesized by the claimants is not arbitrary. To be sure, the two imagined pathways yield the same result: $1 million is moved from Customer A's BLMIS account to

---

[18] The Court assumes here *arguendo* that the Trustee and SIPC are bound by the requirements of due process. However, because the Objecting Claimants' due process argument is substantively deficient, the Court has no occasion to resolve that issue.

Customer B's.  But the form by which this result is achieved matters in practice, because the Trustee's work is bounded by BLMIS's books and records—the Trustee is not empowered to independently investigate the extrinsic financial transactions of a customer.  In the first scenario, all activities occur within the BLMIS universe, and the Trustee therefore is capable of determining, from those books and records, that the transfer to Customer B's BLMIS account from Customer A's was unsupported by net equity.  In contrast, in the second scenario, the hypothesized fact that the $1 million used by Customer A's checking account to fund Customer B's BLMIS account derived from an earlier withdrawal from Customer A's BLMIS account requires review of non-BLMIS records.  It is, therefore, of practical significance whether a claimant's deposits came from another customer's BLMIS account or an exogenous account. And, in the second scenario, the removal of the $1 million from the Madoff universe into a checking account means that, for better or worse, it had been converted to real, hard cash and treated as such by a financial institution outside the BLMIS universe.  Under the principles of the *Net Equity Decision*, deposits into an account from an outside financial institution—whatever their original source—count towards net equity.

As to fairness:  The Inter-Account Method promotes SIPA's fairness objectives because, like the Net Investment Method, it prioritizes the recovery of money for net losers—those who have yet to recover their principal invested.  Appellants note that while a hypothetical BLMIS customer who long ago withdrew more than his or her investment principal from BLMIS and then redeposited it into a separate BLMIS account is entitled to recognition of these funds, appellants are barred from recognition of transfers into their accounts that were unsupported by net equity.  But, as Judge Bernstein explained:  "That the transferor might have selected a different method to transfer fictitious profits that would have escaped the reach of the Trustee's

avoiding powers is hardly a compelling argument for giving legal effect to a Madoff fraud that the Trustee has the means to rectify." *Inter-Account Bankruptcy Decision*, 522 B.R. at 54–55.[19]

As the Trustee reasonably concluded, the overarching inequity that his methodology seeks to rectify is that between net winners and net losers. And as the Circuit emphasized in upholding the Net Investment Method, the "main purpose of determining 'net equity' is to achieve a fair allocation of the available resources among the customers," and that purpose was best served by declining to credit "property that is a fiction" in determining a customer's net equity. *Net Equity Decision*, 654 F.3d at 240. The Trustee's Inter-Account Method furthers that goal by recognizing transfers only to the extent supported by the source account's net equity. Appellants' alternative approach, like the Last Statement Method rejected by the Circuit, would dilute net losers' recovery of their principal, by allowing other customers to make net equity claims based on fictitious investment *profits* where those profits happen to have been transferred among accounts.

The Court is mindful that the Trustee's use of the Net Investment Method and the Inter-Account Method to assure maximal compensation of net losers will unavoidably spawn valid complaints of unfair outcomes as among individual claimants. Such, regrettably, are inherent in any system aimed at compensating numerous customers with scarce funds following the abrupt exposure of a long-running Ponzi scheme.

For instance, the Trustee's methodology may disfavor the later-in-line among transferees: Where a transferring account distributed funds sequentially to multiple recipients but lacked

---

[19] It is unclear how common the practice claimants hypothesize was in which a BLMIS customer withdrew money from one BLMIS account only to deposit it later into another. To the extent this practice was uncommon, claimants' assertion of unfair treatment relative to such a customer would have less traction.

sufficient net equity to cover all such transfers, earlier transferees may benefit insofar as they may be assigned more net equity than later transferees. Similarly, a recipient of a transfer who gave real-world value to the transferor in exchange, but can no longer recover against the transferor via a civil action, may claim unfairness. *See* Arg. Tr. 31–33 (hypothesizing exchange where owner of source account made $1 million inter-account transfer to recipient account, in exchange for ownership of an apartment); *cf. Simkin v. Blank*, 19 N.Y.3d 46, 55 (2012) (while "sympathetic" to litigant's "situation," holding that divorced husband could not recover from ex-wife where his share of marital settlement property included BLMIS account, later revealed as having significantly diminished value). And of course, BLMIS customers who paid gift, estate, or capital gains taxes on transferred funds based on balances fraudulently inflated by Madoff may suffer the additional slight of not being able to recover the fictitious funds or the overpaid taxes.

However, such consequences, as truly unfortunate as they are for those who shoulder them, do not support deviating from the Inter-Account Method, serving as it does as a logical corollary of the Net Investment Method. "SIPA was not designed to provide full protection to all victims of a brokerage collapse, and arguments based solely on the equities are not, standing alone, persuasive." *Time-Based Damages Decision*, 779 F.3d at 81 (quoting *SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 983 (2d Cir. 1974)) (internal quotation marks omitted); *see also Net Equity Decision*, 654 F.3d at 239 ("[I]t is clear that [SIPA] is not designed to insure investors against *all* losses." (emphasis in original) (citing *Packer, Wilbur & Co.*)). In the context of the Madoff Ponzi scheme, the Second Circuit has held that SIPA's net equity calculation justifiably prioritizes assuring that customers are returned their principal investments. Permitting net equity claims by customers who have fully recouped their investments to be inflated by crediting them

with fictitious profits would interfere with this objective. *See Net Equity Decision*, 654 F.3d at 238 ("The inequitable consequence of [the Last Statement Method] would be that those who had already withdrawn cash deriving from imaginary profits in excess of their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed."); *see also Time-Based Damages Decision*, 779 F.3d at 81 (rejecting inflation adjustment for customers' net equity claims as impermissible under SIPA because "each dollar allocated to earlier investors in recognition of inflation reduces the amount of principal recovered by later investors . . . [, providing such earlier investors] a protection from inflation . . . at the expense of customers who have not yet recovered the property they placed in Madoff's hands").

As Judge Bernstein wisely recognized, in the context of distributing scarce proceeds among the many victims of the Madoff fraud, there are many valid ways of viewing fairness. *See Inter-Account Bankruptcy Decision*, 522 B.R. at 54.  In a real sense, any Madoff customer who held a BLMIS account when Madoff's scheme came to light and was unable to withdraw investment holdings on which he or she had long relied was the victim of an epic unfairness. Viewed from the perspective of preserving customer property for distribution to net losers to assure the return of investment principal, as the *Net Equity Decision* instructs is the paramount objective, the Bankruptcy Court properly determined that the Inter-Account Method is fairer, and more congruent with SIPA's purposes, than the appellants' proposed alternative.

### 3. SIPA's Requirement of Treating Accounts Separately

Appellants next argue that the Inter-Account Method improperly combines accounts in violation of SIPA and the SIPC Series 100 Rules.  Appellants' Br. 16–18.

Under SIPA, each customer is entitled to a SIPC advance, up to $500,000, to the extent "the net equity of each customer exceeds his ratable share of the customer property."  15 U.S.C.

§ 78fff–3(a).  However, "a customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity."  *Id.* § 78fff–3(a)(2); *see also id.* § 78lll(11)(C) ("In determining net equity under this paragraph, accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers."); 17 C.F.R. 300.100(b) ("Accounts held by a customer in different capacities, as specified by these rules, shall be deemed to be accounts of 'separate' customers.").  Appellants argue that the Inter-Account Method breaches these provisions because it reduces the transferee account's net equity claim as a result of transactions in a separate account, the transferor account.

This argument incorrectly conflates two distinct issues: (1) whether accounts are held in separate capacities, so as to entitle the customer to a separate net equity determination for each such account, and (2) the mechanics by which the net equity determination is to be made.  The above provisions address the former question only, and bear on eligibility to be treated as a customer for the purposes of making a net equity claim and receiving a SIPC Advance.  Nothing in the Inter-Account Method breaches those rules.  It does not impede the right of the transferor or the transferee account to have separate determinations made of their net equity, or of either to make a claim on the customer property estate on the basis of those separate determinations.  As the Bankruptcy Court observed, the "transferor and transferee accounts remain separate, and their balances are computed separately."  *Inter-Account Bankruptcy Decision*, 522 B.R. at 56. The Inter-Account Method instead is used to determine the extent to which an inter-account transfer should be credited as principal invested so as to add to the transferee's net equity. Looking to the net equity within the transferor account for purposes of this determination does not alter the separateness of the two accounts and of the two customers' net equities.

The Bankruptcy Court, therefore, correctly held that the Inter-Account Method does not violate SIPA or related rules insofar as its treatment of separate accounts.

### 4. Finality

Appellants next argue that the Inter-Account Method breaches federal and state policies regarding the finality of transactions.

As to federal policy, appellants again rely on the two-year statutory reach-back period for voiding a fraudulent transfer. Appellants' Br. 18–19. This objection fails for the same reasons addressed earlier: The Inter-Account Method does not void any transaction, or implicate the finality concerns of doing so. *See supra* Section II.C.1. Indeed, the Second Circuit's *546(e) Decision* underscores the fundamental distinction between a disruptive avoidance action aimed at clawing back previously-transferred money, and using past transactions as part of the process of calculating a customer's net equity, which assessment will then be used to determine the customer's share of recovery from a broker-dealer's customer property estate.

As to New York law, appellants rely on cases in which courts, in the interest of finality, have barred actions to claw back funds or re-open settled agreements where fraud or mistake was later uncovered. *See* Appellants' Br. 19–20 (citing *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 372–76 (1991) (preventing return of funds mistakenly wired to creditor, discharging a debt, where there was no fraud on the part of recipient to avoid unsettling business transactions); *CFTC v. Walsh*, 17 N.Y.3d 162, 170–73 (2011) (rejecting government disgorgement efforts for funds received in divorce settlement by ex-wife of Ponzi scheme perpetrator where wife had no knowledge of fraud); *Simkin*, 19 N.Y.3d at 49–55 (declining to reform marital settlement agreement under theory of mutual mistake or order restitution for unjust enrichment where complaining spouse received BLMIS account, now worth significantly less than believed at the time of the agreement)).

34

These cases, however, are inapposite.  In each, the court held that the policy favoring finality did not permit a bid to *reclaim* money from a party that, unknowingly, had been enriched by a fraud.  *See, e.g.*, *Banque Worms*, 77 N.Y.2d at 372 ("This concern for finality in business transactions has long been a significant policy consideration in this State. . . .  A consequence of this concern has been the adoption of a rule which *precludes recovery* from a third person, who as a result of [a] mistake . . . receives payment . . . in good faith in the ordinary course of business and for a valuable consideration." (emphasis added)).  Like a federal avoidance action, such an action is disruptive and offends obvious finality interests.  The same considerations are not presented by a Trustee's assessments of past transfers for the purpose of making a net equity calculation.  To be sure, claimants' expectations about the worth of their BLMIS accounts may be unsettled, but these were unsettled as a result of Madoff's fraud.  *See Net Equity Decision*, 654 F.3d at 235–36 (customers' "legitimate expectations" do not form basis for ascertaining net equity).  The Inter-Account Method does not seek, any more than the Net Investment Method, to recover funds from customers for inclusion within the customer property estate.  Instead, its goal is to give accountholders credit towards their net equity claims based on a uniform methodology focused on investment principal.

Even if the implementation of the Inter-Account Method under SIPA did conflict with New York law regarding finality—and it does not—such state law would not carry the day.  Given Congress's power to establish uniform laws related to bankruptcies, U.S. Const. Art. 1, § 8, cl. 4, and the Supremacy Clause, U.S. Const. Art. VI, cl. 2, SIPA's system for distributing customer property would take precedence.  *See First Fed. Sav. & Loan Ass'n of Lincoln v. Bevill, Bresler & Schulman, Inc. (In re Bevill, Bresler & Schulman, Inc.)*, 59 B.R. 353, 378 (D.N.J. 1986) (SIPA preempts state laws that would entitle plaintiff to delivery of securities that, under

SIPA, constitute customer property) (citing *Butner v. United States*, 440 U.S. 48, 54 n.9 (1979)), *appeal dismissed*, 802 F.2d 445 & 446 (3d Cir. 1986); *McKenny v. McGraw (In re Bell & Beckwith)*, 104 B.R. 842, 859 (Bankr. N.D. Ohio 1989) (same), *aff'd*, 937 F.2d 1104 (6th Cir. 1991).

The Bankruptcy Court therefore correctly rejected the objections to the Inter-Account Method based on federal and state policies related to finality.

### 5.    Authority of the Trustee

In a final global objection, appellants claim that the Trustee lacks authority to reduce a customer's net equity for any transfers that occurred before January 2001, when BLMIS was formed as a corporate entity.

This argument is based on the June 10, 2009 order of the bankruptcy court, consolidating the estate of Bernard L. Madoff into the SIPA proceeding of BLMIS.  Adv. Pro. No. 08-01789, Dkt. 252 (the "Substantive Consolidation Order").  Notwithstanding the consolidation, the order provided that the Madoff estate's Chapter 7 Trustee, Alan Nisselson, "shall continue to have all powers, rights, claims and interests of a Chapter 7 trustee to bring claims under Chapters 5 and 7 of the Bankruptcy Code," *id.* ¶ 4, and that the SIPA Trustee "shall continue to have the duties and powers of the SIPA Trustee, and, in addition, he shall have all duties and powers of a Chapter 7 trustee for the Madoff estate other than those set forth in paragraph 4 hereof," *id.* ¶ 6. This distinction between the powers of the Chapter 7 Trustee and the SIPA Trustee, appellants argue, deprives the SIPA Trustee authority to seek to avoid transfers made by Madoff, as opposed to BLMIS; and any transfers made before BLMIS was formed in January 2001 were made by Madoff himself, then operating as a sole proprietor.  Appellants' Br. 13–15.  Therefore, appellants argue, the Inter-Account Method improperly "effectively expands the Trustee's powers" by permitting him to "disallow" the value of transfers made prior to 2001.  *Id.* at 14–15.

36

This argument does not follow.  It again is built on a false equation of the Inter-Account Method with a statutory avoidance action.  The Substantive Consolidation Order maintains the distinction between the Chapter 7 Trustee and the SIPA Trustee for the purposes of bringing avoidance actions for the Madoff and BLMIS estates, respectively.  But the calculation of a BLMIS customer's net equity does not constitute such an action.  And the Circuit's *Net Equity Decision* envisions the calculation of net equity based on assessing all principal investments and withdrawals over the life of a customer's account.  This process does not involve avoiding any transactions such as transfers among BLMIS accounts, but only assessing whether the transferor account then had net equity to transfer.

The nature of the corporate form of Madoff's enterprise at the time of the inter-account transfer, or of the prior deposits or withdrawals of the transferor account, is, therefore, irrelevant. In 2001, BLMIS succeeded to the business of Madoff's sole proprietorship, "transfer[ring] to [BLMIS] all of [Madoff's] assets and liabilities, related to [Madoff's] business," which did not "result in any change in ownership or control" of the business. Tr. App'x, T. App. 177, 186 (Form BD, Uniform Application for Broker-Dealer Registration, Amendment, Jan. 12, 2001). This change of corporate form did not alter the net investments of the customer accounts: "Madoff's incorporation did not transmute those fictitious profits into principal."  *Inter-Account Bankruptcy Decision*, 522 B.R. at 60.  It presents no impediment to discounting any fictitious profits found to be part of an inter-account transfer for the purpose of calculating a customer's net equity.

The Inter-Account Method, therefore, in permitting the Trustee to discount inter-account transfers that occurred prior to 2001, does not exceed the Trustee's powers under the Substantive Consolidation Order.

**D.      Context-Specific Objections to the Inter-Account Method**

**1.      ERISA**

Some appellants (the "ERISA appellants")[20] objected to the Trustee's Inter-Account Method to the extent applied to transfers made from qualifying retirement accounts under the Employee Retirement Income Security Act of 1974 ("ERISA").  Thus, even if this method were upheld in general, these appellants argue, transfers from ERISA pension plan accounts must be excepted.  Arg. Tr. 16.

The ERISA appellants primarily argue that the distributions from pension plan accounts must be credited in full because they are protected by ERISA's anti-alienation provision.  Most Br. 12–14.[21]  That provision, 29 U.S.C. § 1056(d)(1), provides that "[e]ach pension plan shall

---

[20] Appellant Michael Most briefed these ERISA-based objections, but, after argument, withdrew from the appeal.  15 Civ. 1223, Dkt. 32.  His claims must be resolved, however, because they were adopted by appellant Sagor, *see* Sagor Br. 30, and the other appellants coordinated in the writing of their briefs to avoid duplication, *see, e.g.*, 15 Civ. 1236, Dkts. 5, 10, 13.  Moreover, after the Court directed any party that intended to rely on Most's ERISA-based arguments to indicate the basis for doing so, *see, e.g.*, 15 Civ. 1236, Dkt. 41, several did so, *see* 15 Civ. 1236, Dkt. 42 (Marsha Peshkin, transfer from pension plan account to individual retirement account ("IRA"); Athena Arvan, inherited profit sharing account); 15 Civ. 1263, Dkt. 38 (Sagor, transfer from pension plan account to IRA).

[21] Other arguments made by Most fail for reasons covered earlier.  Most argues that it is unfair to classify distributions from an ERISA account to an individual's IRA as inter-account transfers because the beneficiary could instead have withdrawn the money outright, rather than rolling it over.  Most Br. 8–11.  But this, as the Bankruptcy Court recognized, "is a variation of the argument"—which it and this Court have rejected—"that the Inter-Account Method is arbitrary because it treats economically equivalent transactions (rollover versus withdrawal and deposit) differently."  *Inter-Account Bankruptcy Decision*, 522 B.R. at 58 n.12; *see supra*, section II.C.2.  Most also invokes two provisions of Chapter 11 which impose limits on avoidance actions.  The first is 11 U.S.C. § 546(a)(1)(A), which imposes a two-year statute of limitations for bringing avoidance actions after the order of relief (which is separate from § 548(a)(1)'s limitation of avoidance actions to transfers that occurred no more than two years prior to the date of the filing of the petition).  Most Br. 11.  The other is 11 U.S.C. § 550(a), which provides that:  "[T]o the extent that a transfer is avoided under [various sections of Chapter 11], the trustee may recover, for the benefit of the estate, the property transferred, or . . . the value of such property from—(1) the initial transferee of such transfer . . . or (2) any immediate or mediate transferee of such initial transferee."  Based on these provisions, Most argues: "Even assuming that the Trustee

provide that benefits provided under the plan may not be assigned or alienated."[22]  They argue that the anti-alienation provision protects the distributions made by an ERISA pension plan account, such that the Trustee cannot reduce or discount, via the Inter-Account Method, the value of a distribution made by a plan account to a beneficiary's separate BLMIS account.

In so arguing, the ERISA appellants rely on *Patterson v. Shumate*, 504 U.S. 753 (1992). There, the Supreme Court held that, under the anti-alienation provision, a debtor may exclude his interest in an ERISA pension plan from the property of the bankruptcy estate.  *Id.* at 755, 757–60, 764–65.  The Court held that thus enforcing the anti-alienation provision did not frustrate the aims of the Bankruptcy Code:  "Our holding . . . gives full and appropriate effect to ERISA's goal of protecting pension benefits.  This Court has described that goal as one of ensuring that 'if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.'"  *Id.* at 764–65 (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 375 (1980)) (citation omitted); *see also id.* at 765 ("[The anti-alienation provision] reflects a considered congressional policy choice, a decision to safeguard a stream of income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them." (quoting *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376 (1990) (internal quotation marks omitted))).

---

could recover against the ERISA pension plans, ERISA would bar any recovery from the beneficiary of the ERISA pension plans as a subsequent transferee."  Most Br. 12; *see also id.* at 19.  These arguments fail because they apply to avoidance actions, not to the calculation of net equity.  *See Inter-Account Bankruptcy Decision*, 522 B.R. at 55–56.  The ERISA appellants do not explain why these provisions limit the Trustee's authority under SIPA to calculate net equity by discounting transfers from accounts lacking corresponding principal at the time of transfer.

[22] ERISA's anti-alienation provision is applicable only to pension plans.  *Milgram v. Orthopedic Assocs. Defined Contribution Pension Plan*, 666 F.3d 68, 72 (2d Cir. 2011).

The anti-alienation provision, however, does not apply to the context at hand.  It serves to prevent judgment creditors from laying claim to an individual's ERISA pension plan benefits. *See Guidry*, 493 U.S. at 371 (anti-alienation provision "erects a general bar to the garnishment of pension benefits from plans covered by the Act"); *Kickham Hanley P.C. v. Kodak Ret. Income Plan*, 558 F.3d 204, 210 (2d Cir. 2009) ("[A] principal rationale behind ERISA's anti-alienation provision is 'the prohibition of involuntary levies by third party creditors on vested plan benefits.'" (quoting *Ellis Nat'l Bank of Jacksonville v. Irving Trust Co.*, 786 F.2d 466, 470 (2d Cir. 1986)).

The Inter-Account Method does nothing of the sort.  The Trustee is not a creditor seeking to collect against an inter-account transferee, or to garnish or levy on a pensioner's benefits.  On the contrary, it is the inter-account transferees who are customer-creditors of the BLMIS estate, and the Inter-Account Method is part of the process used to measure the extent of their (and others') claims against the customer property amassed by the Trustee.  Unlike including pension benefits in the property of a bankruptcy estate, calculating whether an inter-account transfer of such funds was supported by principal in the transferor account does not breach the "restriction on the transfer of a debtor's beneficial interest in the" pension plan.  *Patterson*, 504 U.S. at 759 (internal quotation marks and citations omitted).  Put differently, the Inter-Account Method entails neither an assignment nor an alienation of pension plan benefits.  The Supreme Court in *Patterson* and *Guidry* explained the determination not to create *exceptions* to the anti-alienation provision.  The Supreme Court's analysis there does not apply where no alienation or assignment is implicated.

The ERISA appellants' argument fails for a second reason.  The anti-alienation provision protects vested ERISA pension plan benefits that have *not* been distributed.  *See United States v.*

*All Funds Distributed To, or on Behalf of, Weiss*, 345 F.3d 49, 56 (2d Cir. 2003) ("It is well-established that under ERISA's anti-alienation provision, pension benefits or funds may not be 'assigned or alienated' while the money is held by the plan administrator." (citation and footnote omitted)); *id.* at 57 (government could not seek forfeiture of money obtained from fraudulent Medicare claims "until the . . . pension plan funds were distributed to the plan beneficiaries"). Here, however, the distribution of funds from the ERISA pension plan account has already occurred. The Trustee instead proposes to use the Inter-Account Method, in relation to such distributions, to gauge the value of the transfer for the purpose of the measuring the transferee's net equity claim.

The Court therefore rejects the ERISA-based objections to the Inter-Account Method.[23]

---

[23] Because the Court finds that the application of the Inter-Account Method does not contravene ERISA's anti-alienation provision, it has no occasion to resolve the parties' dispute whether, if it had, ERISA's subordination provision would require that provision to yield to SIPA's net equity calculation. *See Inter-Account Bankruptcy Decision*, 522 B.R. at 58–59. The subordination provision, 29 U.S.C. § 1144(d), provides: "Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under such law." Application of the subordination clause requires analysis of the best way to "reconcile[]" two federal statutes or statutory schemes when they conflict. *Guidry*, 493 U.S. at 375–76 (holding anti-alienation provision not subordinate to remedial provision of Labor-Management Reporting and Disclosure Act of 1959, thereby precluding imposition of constructive trust on convicted embezzler's pension benefits); *see also Patterson*, 504 U.S. at 763–65 (although not expressly referencing ERISA's subordination provision, holding that Bankruptcy Code's broad definition of includable property, and any "policy" that could be gleaned from it, did not overcome anti-alienation provision). The Court here has no occasion to determine whether the anti-alienation provision, had it applied to the calculation of net equity for accounts affected by inter-account transfers, would impair SIPA, and if so, must be subordinated to SIPA, or whether there would be a better way to reconcile any conflict. *See SIPC v. Jacqueline Green Rollover Account*, No. 12 Civ. 1039 (DLC), 2012 WL 3042986, at *8 n.4 (S.D.N.Y. July 25, 2012) (observing, but not deciding, that to overcome ERISA's subordination provision, claimants would have to show that their proposal "would not impair the functioning of SIPA's scheme for distributing advances to customers of the debtor," and noting that such a showing might "prove challenging").

41

### 2.      Transfers from a Shared Account to Which Claimant Contributed

Appellant Elliot G. Sagor raises an objection related to the application of the Inter-Account Method to a specific scenario: in which a claimant receives in his individual BLMIS account an inter-account transfer from a different BLMIS account ("a shared account") in which multiple persons, including the claimant, participated as investors.  Under the Inter-Account Method, if the shared account was a net winner at the time of the transfer—*i.e.*, if its cash withdrawals exceeded its cash deposits such that the shared account had no net equity—the transfer to the claimant's individual account would not be treated as adding value.  Sagor protests this result where, at the time of the transfer, the claimant himself was a net loser within the shared account—that is, where the shared account in the aggregate was a net winner, but the individual claimant had not recouped the money he had personally invested in the shared account.

Sagor's personal circumstances, as he proffers them, illustrate this scenario.  Along with partners at his then-law firm, Sagor invested $175,000 in "an omnibus account at BLMIS."  The omnibus account was titled "Stanley I. Lehrer & Stuart M. Stein, Joint Venture."  Later, but before exposure of Madoff's fraud, Sagor caused the transfer of his entire share of that omnibus account, which BLMIS then valued at $640,682.00, to Sagor's individual BLMIS account. Sagor Br. 2–3; Sagor Reply 7.  Sagor represents that, before that point, he, personally, had never withdrawn funds from the shared account.  Applying the Inter-Account Method, the Trustee valued the transfer to Sagor's individual BLMIS account at $0, because, as of Sagor's transfer, the withdrawals by other participants in the shared account (*i.e.*, Sagor's law partners) had exceeded the cash deposits into that account.  *See* Sagor Br. 4–6.  Sagor argues that, in these circumstances, the Inter-Account Method yields an unjust result, and that its methodology should be modified to value the transfer instead based on Sagor's investments into and withdrawals

from the shared account, without any credit for investment gains, thereby resulting in a transfer valuation of $175,000.  Sagor Br. 10.

The Bankruptcy Court rejected Sagor's challenge to the Inter-Account Method.  It held that, to achieve the result Sagor desired, a claimant such as he would have to establish that he had been a separate "customer" of BLMIS in the shared account within the meaning of SIPA. Under those circumstances, Sagor would be entitled to have the inter-account transfer valued in light of his own personal contributions and withdrawals from the shared account.  *Inter-Account Bankruptcy Decision*, 522 B.R. at 61.  Otherwise, the Bankruptcy Court held, the proper unit of measure of the shared account's net equity was at an account-wide level.

The Court agrees and holds that the Bankruptcy Court's decision was correct, leaving for later proceedings before the Trustee the determination of whether Sagor was, in fact, a separate customer of BLMIS with respect to the shared account.[24]

Salient here, the Second Circuit has addressed SIPA's treatment of the circumstance in which multiple individuals have invested in a common BLMIS account.  In *Kruse v. SIPC (In re*

---

[24] The Bankruptcy Court did not resolve whether any one Objecting Claimant, including Sagor, was a separate customer of a shared transferor account.  Such determinations would require fact-intensive inquiries beyond the scope of the motion before it.  *Inter-Account Decision*, 522 B.R. at 61.  The Trustee argues that because Judge Bernstein's decision was at a conceptual level and did not resolve Sagor's net equity or whether he was a separate customer in the shared account, and because Sagor may yet prevail if he is held to have been such, his appeal now is premature. *See* Tr. Br. 32; Arg. Tr. 76–79.  SIPC, though agreeing with the Trustee that Sagor's objection was "outside the scope of the Trustee's motion," addressed, briefly, the merits of the objection. SIPC Br. 21.  The Court finds that Sagor's appeal now is proper.  Judge Bernstein's holding— that the transfer's value must be calculated (absent a finding of individual customer status) based on the net equity in the shared account as a whole—is adverse to Sagor, in that it closes off one route to relief for him.  Judge Bernstein held that separate customer status in the transferor account is required for net equity to be calculated as Sagor contends, and rejected Sagor's objection to the Inter-Account Method.  *See* Order, at 3; *id.*, Ex. 1 at 10.  Although Judge Bernstein did not ultimately make a net equity determination as to Sagor or determine whether he was a customer with respect to the shared account, his decision articulated the legal rule that will govern the application of this method to Sagor's case.

*BLMIS)*, 708 F.3d 422, 426–27 (2d Cir. 2013), the Circuit held that investors in feeder funds

which in turn invested in a BLMIS account were not themselves customers of BLMIS.  And,

because they were not customers, the individual investors could not, separate from the feeder

funds, make claims on the customer estate to the extent of their personal net equity.  *See id.*  As

the Circuit explained, an investor has an "obvious" incentive to seek separate customer status,

because, "[t]o the extent BLMIS's assets are insufficient to compensate 'customers' for their

investment losses, each recognized 'customer' can seek to have its remaining losses

compensated by the [SIPC]—subject to a cap of $500,000 per 'customer'—out of a special fund

capitalized by the general brokerage community."  *Id.* at 426.

　　　Customer status under SIPA, the Circuit explained, turns on "the entrustment of cash or

securities to the broker-dealer for the purposes of trading securities," *id.* (quoting *Net Equity*

*Decision*, 654 F.3d at 236) (internal quotation marks omitted), and the statutory provisions

governing customer status are subject to "narrow interpretation," *id.* (quoting *Stafford v. Giddens*

*(In re New York Times Sec. Servs., Inc.)*, 463 F.3d 125, 127 (2d Cir. 2006)).  In the case before it,

the Circuit held that the investors in the feeder funds were not themselves BLMIS customers

because the investors "(1) had no direct financial relationship with BLMIS, (2) had no property

interest in the assets that the Feeder Funds invested with BLMIS, (3) had no securities accounts

with BLMIS, (4) lacked control over the Feeder Funds' investments with BLMIS, and (5) were

not identified or otherwise reflected in BLMIS's books and records."  *Id.* at 426–27.  These

factors drew on an earlier decision, *SIPC v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir.

1976), in which the Circuit had held that "employee-beneficiaries of a profit-sharing plan were

not 'customers' of a debtor under SIPA."  *Kruse*, 708 F.3d at 427; *see also SIPC v. Jacqueline*

*Green Rollover Account*, No. 12 Civ. 1039 (DLC), 2012 WL 3042986, at *11–13 (S.D.N.Y. July

25, 2012) (finding, based on analysis of the *Morgan, Kennedy* factors, that participants in ERISA-regulated plan that invested with BLMIS were not customers of BLMIS).[25]

Much as the *Net Equity Decision*, contemplating a single account, informs the Court's evaluation of the appropriateness of the Inter-Account Method for assessing transfers between two accounts, *Kruse* informs this Court's analysis of how a transfer from a shared account to a second account is properly treated. A hypothetical again illustrates the issue: Five partners at a law firm, A, B, C, D, and E, open a shared BLMIS account, Account 1, in the name of the law firm, and each invests $1 million in it, such that Account 1 has a balance of $5 million. Over time, Madoff awards the account "profits," and the account's stated balance reaches $10 million. The partners have never made any withdrawals. At this point, Account 1 would have a net equity of $5 million. No credit is given for the fictitious profits that inflate the account balance above the $5 million investment principal. And under *Kruse*, unless the partners are able to establish separate customer status, if the available customer property could not compensate the partners for their full $5 million net equity claim, SIPC would be required to cover the difference up to $500,000 in total.

Now suppose that the partners no longer wish to share the account. Partners A, B, C, and D each withdraw in cash their portions of the account—*i.e.*, $2 million each. Fortunately for these partners, they have unintentionally converted Madoff's fraud into cash to their personal benefit.[26] At this moment, $8 million has been withdrawn from Account 1, more than the $5 million originally deposited in it, and $2 million (E's share) remains as the account balance.

---

[25] The Circuit's decision in *Kruse* upheld Judge Cote's earlier decision regarding the customer status of investors in feeder funds. *See Kruse*, 463 F.3d at 425–26.

[26] For present purposes, the Court assumes that the Trustee could not claw back these partners' withdrawals in excess of their principal investments.

Under *Kruse*, unless Partner E can establish that he was a separate "customer" of BLMIS in the shared account, net equity would be calculated for the account as a whole, with a value of $0 because more money had been withdrawn than was deposited.  Therefore, if the law firm, on E's behalf, after revelation of Madoff's fraud, filed a claim on the customer property, there would be no recovery for E from the customer property or SIPC.

Now suppose that, rather than making a claim on the customer property from Account 1, E set up a second, separate, individual account with BLMIS, Account 2, and, after all the other partners had already made their withdrawals, transferred the $2 million remaining in Account 1 to Account 2.  Given that Account 1 had no net equity in it, it would be inconsistent with the *Net Equity Decision* to credit Account 2 with $1 million of net equity (E's initial investment) simply because a paper transfer had been made from an overall net-winner BLMIS account (Account 1) to Account 2.  And given that Account 1 was a collective account in which the five individual investors were not customers, it would not be consistent with *Kruse* to allow the establishment of a second, separate account (Account 2) in the customer's name to change that result, so as to permit a net equity calculation to be made at the level of one investor in that transferor account.

The core function of the Inter-Account Method, as a logical corollary of the approved Net Investment Method, is to determine whether a transfer from one BLMIS account to another was backed by, and therefore should be construed as having transferred, real principal as opposed to fictitious investment profits.  That function is accomplished by netting deposits and withdrawals to determine what, if any, net equity was available to be transferred.  But, as the hypothetical above illustrates, the treatment Sagor champions—ignoring the fact that a shared account is a net winner incapable of transferring net equity to another, and instead disaggregating the account at the level of the individual investor so as to recognize transfers to net losers within the shared

46

account—would yield results inconsistent with the Net Investment Method.  The transfer of

money, on paper, cannot create net equity; a transferor cannot transfer what it does not have.

Creating an exception to the overall Net Investment Method to bolster Sagor's recovery would

work a detriment on BLMIS's net-loser customers.  As the Circuit put the point in the *Net Equity*

*Decision*:  "Any dollar paid to reimburse a fictitious profit is a dollar no longer available to pay

claims for money actually invested."  654 F.3d at 235 (quoting *Net Equity Bankruptcy Decision*,

424 B.R. at 141) (alteration and internal quotation mark omitted).

 The Bankruptcy Court therefore correctly ruled that the net equity value of the transfer is

properly calculated, instead, at the level of the transferor "customer."  That approach accords

with SIPA's statutory language and structure, as analyzed in the *Net Equity Decision*, for several

reasons.

 First, net equity, as a concept, is keyed to the customer.  Eligibility for SIPA protection,

and thus the ability to make a claim on the customer property to the extent of one's net equity, is

premised on being a "customer" of the debtor.  *Net Equity Decision*, 654 F.3d at 236 ("If the

objecting claimants are not 'customers,' they are not entitled to the protection of SIPA at all."

(citation omitted)).  Indeed, SIPA defines net equity as "the dollar amount of the account or

accounts of a customer."  15 U.S.C. § 78lll(11).  It follows that determining the value of a

transfer is appropriately determined by appraisal of the available net equity of the transferor

customer.

 Second, calculating net equity at the BLMIS customer level of the transferor accords with

the one part of that debtor's books and records that has been held worthy of recognition.  The *Net*

*Equity Decision* held that the method for determining net equity in a given case must accord with

SIPA's requirement that the Trustee pay out claims based on a customer's net equity "insofar as

such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." *Net Equity Decision*, 654 F.3d at 237 (quoting 15 U.S.C. § 78fff–2(b)(2)) (internal quotation mark omitted). The books and records of BLMIS allow the Trustee to establish, at the level of the customer, whether a transfer reflected invested principal or fictitious profits. Indeed, one *Morgan, Kennedy* factor considered for determining customer status is whether the investor was "identified or otherwise reflected in BLMIS's books and records." *Kruse*, 708 F.3d at 427. And the *Net Equity Decision* holds that SIPA's books and records provision supports calculating net equity based on the cash inflows and outflows of a BLMIS account because those cash activities were "the only accurate entries" reflected in customers' account statements. *See Net Equity Decision*, 654 F.3d at 232; *see also id.* at 236–39. In the context of a shared account treated as having a single customer, it follows that the net equity calculation is to be made holistically, at the account level.

While maintaining the right to attempt to establish that he was a separate "customer" of the shared "Stanley I. Lehrer & Stuart M. Stein, Joint Venture" account, Sagor makes three distinct objections why—assuming he is not so held— that transferor account's net equity should not be determined on a unitary basis.

First, he argues, it is irrelevant whether he is a customer of the shared transferor account because he is a customer of his own personal BLMIS account. Therefore, he argues, he should be entitled to have all of his investments in BLMIS, regardless of the account in which they were made, aggregated for purposes of determining his net equity. Sagor Br. 12, 20 n.17, 23–25, 27–29; Sagor Reply 3 n.5, 11–12. Therefore, he argues, *Kruse* and similar cases are inapposite because the investors in the feeder funds at issue there had no independent customer relationship with BLMIS.

This argument disdains, and misapprehends the purpose of, the assessment of who the customer or customers were as to a particular transferor account. The purpose of this inquiry is not to determine *eligibility* to be credited with an inter-account transfer, but rather how the *value* of the transfer is calculated under the Inter-Account Method.[27] If the shared transferor account had sufficient net equity to cover the transfer, the transferee's net equity would be credited— whether or not that transferee was affiliated with, and a separate customer of, the shared account. Arg. Tr. 77. And generally, where the overall transferor account had zero net equity—as calculated based on *all* deposits into and withdrawals from the account—the transfer would be valued at $0. But, if the transferee were a separate BLMIS customer in the shared transferor account, the value of the transfer would be determined by that transferee's individual deposits into and withdrawals from the shared account, rather than by all deposits and withdrawals. Arg. Tr. 79–81.

To the extent Sagor's objection is that his status as a customer of the transferee personal BLMIS account entitles him to have his deposits into and withdrawals from the shared transferor account treated as if he were a separate customer with respect to that account, that argument fails. *See* Sagor Br. 16–17, 20 (arguing that an investor should be evaluated based on all his personal cash-ins and cash-outs where he "has his own personal BLMIS account," *id.* at 20); *see also* Sagor Reply 3 n.5, 11–12. SIPA's protections for customers do not attach to individuals in all of their capacities, but rather are specific to the particular financial transactions an individual has as a customer of the broker-dealer. *See SIPC v. Stratton Oakmont, Inc.*, 299 B.R. 273, 277 (Bankr. S.D.N.Y. 1999) ("SIPA protection is not an absolute privilege but a qualified one which

---

[27] *Cf.* Sagor Br. 23 ("I[f] the [transferor] account is a net-winner, the Trustee gives any transferee no credit for any transfer. This is so even if the transferee were a 'customer' of the account. What difference would 'customer' status make?"); *cf. also* Sagor Reply 3, 7, 10–11 & n.19.

depends primarily on the nature of the claim and the purpose of the client's account with the defunct broker-dealer. . . .  [A]n investor can be a customer vis-a-vis certain transactions but not others." (citation omitted)), *aff'd sub nom.*, *Arford v. Miller (In re Stratton Oakmont)*, 210 F.3d 420 (2d Cir. 2000) (per curiam).  Sagor's status as a customer by virtue of his later-established individual account cannot retroactively change the treatment of deposits that were made, from BLMIS's vantage point, unitarily by the Joint Venture in which Sagor participated with his law partners.  And assigning value to a transfer from a shared account that had no net equity to transfer simply because an investor-participant in that account had an independent customer relationship with BLMIS would assign value to Madoff's fictitious investment gains, in blatant contravention of the *Net Equity Decision.*

Sagor's second objection is that because Madoff commingled investors' money and did not, in reality, maintain investors' money separately by account, it is a fiction to treat a shared account as a unitary entity such that the withdrawals of other participants in that account should work to his detriment.  Sagor Br. 18–19, 25–26; Sagor Reply 1 n.2.  But, as the Second Circuit emphasized in the *Net Equity Decision*, the one aspect of the books and records kept by Madoff that is accurate is their reporting of the cash deposited and the cash withdrawn from various accounts.  The customer's account is, thus, an appropriate, and not misleading, unit of measure to determine whether an account, at any given time, had sufficient net principal invested to permit a transfer to convey value to a recipient account.

Sagor's third— and most compelling—objection is equitable in nature.  He argues that it is unfair for the Trustee not to recognize that, even though the shared account was a net winner, he was a net loser with respect to it.  Therefore, he argues, both equity and the goal of favoring net losers undergirding the *Net Equity Decision* support crediting the transfer from that account

to his individual BLMIS account, up to the amount ($175,000) of his unrecovered principal in the shared account. Sagor Br. 10–11, 14–22, 26–27, 29; Sagor Reply 4–5, 9.  To this end, Sagor argues:  "[The] most important and highest goal to accomplish [in calculating net equity] is to make investors as whole as possible."  Sagor Br. 19.  Sagor urges that a limited exception be made to the Inter-Account Method, to cover the circumstance in which transfers from a valueless shared account would be recognized (1) where they are to a person who had an independent customer account with BLMIS, and (2) to the extent the person was a net loser with respect to the shared account.

Sagor's circumstances are undoubtedly sympathetic.  But the modification he seeks to the Inter-Account Method unavoidably results in recognizing fictitious Madoff investment profit, because by the time the transfer to him was made from the shared account, that account, viewed in the aggregate, had recouped its investment principal.  Sagor personally had not done so, but the law partners with whom he teamed in the Joint Venture had.  If the Joint Venture is viewed as the SIPA "customer" of the shared account—as Sagor's objection presupposes *arguendo*— then adoption of his proposed approach would place the Joint Venture as a whole in a preferred position relative to any other Madoff customer claiming a share of the BLMIS customer property estate.  And recognition of fictitious Madoff investment gains has the effect of eroding the recoveries of all net loser customers from that estate.  *See Net Equity Decision*, 654 F.3d at 235. The equities thus are more complicated than suggested by a myopic focus on Sagor's personal circumstances alone.

Moreover, the Court is unpersuaded that the "tweak" that Sagor proposes to the Trustee's methodology is as limited as he suggests.  Sagor Br. 12, 14; Sagor Reply 1–2 & n.3, 4–5 & n.12, 9.  If Sagor's proposal were accepted as a means of generating a more favorable outcome for

himself, it logically follows that other net losers within net-winner shared accounts would have a claim for similar treatment.  The Trustee could then be expected to be asked to modify the Inter-Account Transfer method—or the Net Investment Method itself—to pierce through the single-customer status of other shared accounts (such as retirement accounts or feeder accounts) to examine, with respect to each individual investor within such an account, the balance of that investor's cash investments and withdrawals.

Sagor resists this outcome, arguing that the only modification that is needed is to the Inter-Account Method where the recipient account was held by a BLMIS customer who also invested in the shared account.  But an investor in a shared account has no stronger equitable claim on the BMLIS customer estate than others merely because of the happenstance that he had an independent existence (a separate, individual account) within the BLMIS universe.  In the end, Sagor's equitable argument could be made with equal force by net-loser contributors to any collective account who find themselves disfavored as a result of their peers' earlier withdrawals.

The Court therefore is constrained to affirm the Bankruptcy Court's denial of Sagor's objection.  Sagor remains at liberty to seek to establish before the Trustee (and the Bankruptcy Court) that he was a separate customer of BLMIS with respect to the "Stanley I. Lehrer & Stuart M. Stein, Joint Venture" account.[28]  The value of an inter-account transfer from a shared account is properly determined by the net deposits and withdrawals of the customer's account unless the individual investors in the shared account can establish separate customer status.

*** 

---

[28] Sagor is, of course, also at liberty to explore whether he has any timely legal remedies against his law-partner joint venturers who withdrew money earlier from the shared account, or to seek to persuade them or their heirs, as a matter of honor, to make him whole relative to them.

After consideration of appellants' general and specific objections, the Court, therefore, holds that the Inter-Account Method properly applies the Second Circuit's *Net Equity Decision* and is not otherwise prohibited by law.  This method is superior as a matter of law, and not "clearly inferior," to the proposed alternatives offered by appellants for calculating net equity under SIPA, and is therefore affirmed.  *See Net Equity Decision*, 654 F.3d at 238 n.7.

## CONCLUSION

For the reasons stated above, the Order of the Bankruptcy Court approving the use of the Inter-Account Method is affirmed and the appeals challenging the Order are denied.  The Clerk of Court is respectfully directed to close the above-captioned cases.[29]

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 14, 2016
New York, New York

---

[29] Because Appellant Most withdrew his appeal prior to the issuance of this Opinion, the Court does not rule here on his appeal, 15 Civ. 1223.  In light of the withdrawal of the appeal, the Clerk of Court is respectfully directed to close that case as well.